UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
Southern Division

| | |
|---|---|
| MATTIE FOSTER,<br>   Plaintiff; | )<br>)<br>) |
| -vs.- | ) Case No. CV 99-P-1838<br>) |
| UNITED STATES OF AMERICA,<br>   Defendant. | )<br>)<br>)<br>) |

## OPINION

  Mattie Foster brought this action seeking a refund of $237,139.00 (plus interest and attorney's fees) for overpayment of income taxes, penalties, and interest for the calendar year 1994. By amendments to the complaint, Foster also seeks damages under IRC § 7433, premised upon the collection of taxes that, she alleges, were erroneously assessed. The United States has moved for summary judgment with respect to the tax refund claim and has moved to strike and to dismiss the § 7433 damage claim. The three motions are under submission after extensive written briefs and oral argument. All of the issues appear to be ones of law, not involving genuine disputes with respect to any material facts.

  This controversy arises as a result of the collection of a state court judgment rendered in Foster's favor against Life Insurance Company of Georgia ("Life of Georgia"). In that case, Foster had charged Life of Georgia with fraud in selling her a Medicare supplement insurance policy that was essentially worthless because she did not have Medicare coverage. After a jury trial and an appeal, the Alabama Supreme Court upheld an award to her of $50,000 in compensatory damages—consisting of $95 in damages for a disallowed claim for medical expenses under the policy, of $2,468.60 in damages for the premiums paid for the policy, and of $47,436.40 as damages for emotional distress and mental anguish—and of $1,000,000 in punitive damages. *Foster v. Life Ins. Co. of Georgia*, 656 So.2d 333 (Ala. 1994). This award, plus $156,032.80 in post-judgment interest, was paid in 1994 through a single check issued by Life of Georgia jointly to Foster

and her attorneys. Consistent with their fee arrangement, the attorneys then paid Foster $525,000, which was 50% of the amount of the judgment.

Foster did not report in her federal income tax return any portion of this recovery as gross income (nor did she claim any portion of the attorneys' fees as a deduction). In 1997 the Internal Revenue Service assessed—and then, through levy on an annuity policy purchased by Foster from proceeds of the judgment, collected—a tax deficiency for 1994, calculated by treating the punitive damages and interest portions of the amount paid by Life of Georgia as Foster's gross income, though allowing amounts retained by her attorneys as an itemized miscellaneous deduction. After the denial of Foster's claim for a tax refund (in which she did not challenge the inclusion in gross income of interest on the judgment), this current action was filed.[1]

I. Tax Refund Claim.

Foster concedes that interest on the judgment would be reportable as gross income, subject to an issue regarding treatment of attorney's fees. She contends, however, that the balance of the recovery did not have to be included in gross income because of § 104(a)(2) of the Internal Revenue Code of 1986. That section, as it read in 1994 (and, indeed, had read with only one minor change since 1918), excluded from gross income "the amount of any damages received . . . on account of personal injuries or sickness." Foster's argument for exclusion of punitive damages emphasizes a 1989 amendment that added at the end of § 104(a) this language: "Paragraph (2) shall not apply to any punitive damages in connection with a case not involving physical injury or physical sickness." Relying upon *Cotnam v. Comm'r*, 263 F.2d 119 (5th Cir. 1959), Foster also contends that the amounts retained by her attorney under their fee agreement should reduce—"dollar-for-dollar"—any amounts otherwise reportable in her gross income, rather than merely be allowed as an itemized miscellaneous deduction.[2]

The United States concedes that at least the major portion of the $50,000 compensatory damages

---

1. Foster's attorneys in this tax refund action are not the same as those who represented her in the tort case.
2. Primarily as a consequence of the "floor" on these deductions (2% of adjusted gross income), of the limitation on itemized deductions, and of the Alternative Minimum Tax, Foster's tax liability is substantially greater if attorney's fees are treated as deductions rather than as reducing her gross income.

2

award is not to be included in Foster's gross income.[3] But it contends that, under *O'Gilvie v. United States*, 519 U.S. 79 (1996), the punitive damages portion of the recovery from Life of Georgia is (together with the interest on the entirety of the judgment) to be included in her gross income. And it argues that *Cotnam* is simply wrong in holding that amounts withheld from a recovery by an attorney under Alabama's attorney lien statute reduce a taxpayer's gross income.[4] It contends that such payments merely qualify for treatment as an itemized miscellaneous deduction incurred in the production of taxable income.

It is clear that—

- If the pre-1989 version of § 104(a)(2) of the Internal Revenue Code of 1954 governed this case, the punitive damages portion of the judgment would, because of the Supreme Court's 1996 decision in *O'Gilvie* interpreting that provision of the Code, have been reportable as Foster's gross income (subject to the question of how attorney's fees are to be treated).

- If the 1996 revision of § 104(a) had been in place in 1994, the punitive damages—and, indeed, most of the compensatory damages—would, because of the clear statutory language,[5] have been reportable as Foster's gross income (subject to the question of treatment of attorney's fees).

The question regarding taxation of punitive damages arises because of the language added to § 104(a) by the 1989 amendment.

In *O'Gilvie*, the Supreme Court concluded that the recovery of punitive damages—even in a wrongful death case—did not constitute damages received "on account of" personal injuries such as to qualify for exclusion from gross income under § 104(a)(2). The language of § 104(a)(2) in effect in *O'Gilvie* was still the same in 1994, when Foster's judgment against Life of Georgia was collected. The 1989

---

3. Curiously, the government in its summary judgment motion, unlike the position taken when the tax deficiency was assessed, does not concede that the $95 in damages for the unpaid claim for medical expenses under the policy and the $2,468.60 in premiums paid for the policy are excludable from gross income. However, even if it is appropriate to divide the compensatory damages into its constituent elements, these would clearly be damages received "on account of personal injuries" covered by the § 104(a)(2) exclusion, there being no indication that Foster in earlier years had deducted these items under § 213.

4. The government is currently making this argument to the 11th Circuit in a case appealed from the Tax Court.

5. The 1996 amendment limited the exclusion from gross income under § 104(a)(2) to "amounts of any damages (other than punitive damages) received * * * on account of personal physical injuries or physical sickness," and then replaced the 1989 addition at the end of § 104(a) with the following:

"For the purposes of paragraph (2), emotional distress shall not be treated as a physical injury or physical sickness. The preceding sentence shall not apply to an amount of damages not in excess of the amount paid for medical care (described in subparagraph (A) or (B) of section 213(d)(1)) attributable to emotional distress."

The 1996 amendment also added a subsection addressing the special problem presented by Alabama's wrongful death laws, which continue to permit only punitive damages.

3

amendment to § 104(a) did not create an additional exclusion from gross income or expand the exclusion afforded under § 104(a)(2). Rather, it attempted to make clear—at a time when, before *O'Gilvie*, the law was uncertain—that there would be no exclusion from gross income of punitive damages in the absence of "physical" injuries. Because the 1989 amendment at most only limited the potential reach, and did not expand the exclusion, of § 104(a)(2), there is no reason to speculate on whether—if the dissent in *O'Gilvie* had been adopted as the Court's decision—Foster's 1994 punitive damage recovery would nevertheless have constituted gross income because her compensatory damages were arguably not damages for "physical" injuries under the 1989 amendment.

Having concluded that the punitive damages were subject to inclusion in gross income, the court next turns to the question of the proper treatment of the attorney's fees. The contingent fee agreement between Foster and her attorneys, entered into before her action against Life of Georgia was filed, called for a 50% division of "all sums collected." It also provided that all costs and expenses incurred in the preparation and trial of her case would be paid by Foster "upon demand,"[6] and that "if for any reason this matter is appealed . . . a fee for appellate services will be negotiated at that time."

Under *Cotnam*, a pre-split Fifth Circuit decision binding on this court, the fee agreement had the effect of an assignment by Foster to her attorneys—without realizing income then or later—of a fifty percent share in her speculative chose-in-action, with the consequence that, when later there was a successful pursuit of that claim, Foster was subject to potential taxation only with respect to her remaining fifty percent share of the recovery. In the present case, it is appropriate to apply *Cotnam* by treating Foster as having assigned to her attorneys, through the contingent fee agreement, half of her claim for punitive damages, half of her claim for compensatory damages, and half of any claim for post-judgment interest. See also *Estate of Clarks v. United States*, 202 F.3d 854 (6th Cir. 2000); *Davis v. Comm'r*, T.C. Memo. 1998-248, 1998 WL 373342 (July 7, 1998). What this means is that Foster's 1994 gross income does not include her attorneys' half of the punitive damages ($500,000) or her attorneys' half of the interest ($78,016.40) ultimately paid by Life

---

6. The disagreement between the parties as to the treatment of amounts paid to an attorney for costs and expenses, rather than as a fee for services, is without significance since in fact Foster was never called upon to pay any such items.

4

of Georgia.

As noted above, the initial fee agreement provided that, in the event of an appeal, a fee for appellate services would be negotiated at that time. After the jury returned its verdict—awarding Foster $1,000,000 in punitive damages and $250,000 in compensatory damages—the trial judge entered a judgment for the compensatory damages but, because of a legislative "cap," reduced the punitive damages to $250,000. There were then cross-appeals by both Foster and Life of Georgia. A few months later, in June 1993, the Alabama Supreme Court in another case, *Henderson v. Alabama Power Co.*, 627 So. 2d 878 (Ala. 1993), declared unconstitutional the legislative cap on punitive damages. In January 1994, the Supreme Court reinstated Foster's $1,000,000 punitive damage verdict, but ordered a conditional remittitur to $50,000 of the compensatory damage verdict, which she subsequently accepted.

The agreement negotiated between Foster and her attorneys at the time of the appeals was that the attorneys' fees for appellate services would also be contingent upon their success. The agreement was that, as the fee for such services, the attorneys would be entitled to all of the post-judgment interest ultimately collected, if any, rather than only to the 50% previously assigned under the initial agreement for services at the trial level. In this tax case, Foster contends that the additional amount ($78,016.40) retained by her attorneys from the post-judgment interest recovered from Life of Georgia for appellate services should also be excluded from Foster's gross income under *Cotnam*.

The court agrees, however, with the government's contention to the contrary. *Cotnam* did not involve, and should not control, the taxability of attorneys' fees under an assignment made after a chose-in-action had been transformed through a jury trial into a money judgment, a part of which (including post-judgment interest) would constitute gross income if and when received. When Foster and her attorneys agreed on the additional fee for appellate services, her claims had been upheld by the jury and given a value (before interest) of $1,250,000, though reluctantly reduced by the trial judge to $500,000 because of the legislative cap. The uncertainties created by the cross-appeals, particularly until issuance of the *Henderson* decision several months later, do not make inapplicable the general principles affecting taxability of "assignments of income" stemming from *Lucas v. Earl*, 281 U.S. 111 (1930), and *Helvering v. Horst*, 311

5

U.S. 112 (1940).

The decision of the court is that the additional $78,016.40 in interest retained by her attorneys should be treated as reportable interest income received by Foster and then as paid to her attorneys as fees for appellate services. The payment of these fees, however, qualifies in major part for the deduction under § 212 as an expense incurred for the production or collection of income. The deductible portion of this fee is $74,781.98, calculated by treating the fee as in part for the collection of the taxable portions of her recovery (*i.e.*, the $578,016.40 in punitive damages and interest) and in part for the collection of $25,000 in compensatory damages, which is not gross income.

To summarize, in determining Foster's tax liability for 1994, there is to be included in her gross income $500,000 received as punitive damages and $78,016.40 as interest income, and she is entitled to a miscellaneous itemized deduction (subject to the floor) of $74,781.98. Without abandoning its arguments that *Cotnam* was incorrectly decided, the government, responding to the court's request made at the close of oral argument on the pending motions, has calculated Foster's tax liability in accordance with the above principles. Those calculations, contained in Exhibit 4 to its memorandum filed February 29, 2000, reflect an overpayment by Foster of taxes, penalties, and interest totaling $168,784.05.[7] The calculation also indicated that as of February 29th the interest on this overpayment would have amounted to $29,943.94. The court finds no error in these calculations.[8]

The court agrees with the United States that, on the basis of undisputed facts, judgment as a matter of law is appropriate under Fed. R. Civ. P. 56 with respect to the refund claim. That this judgment—denying part of the refund claim, but granting other parts—is not exactly what the government has requested does not mandate denial of the motion or, indeed, mandate a cross-motion for summary judgment by Foster. Rule

---

7. The calculations also reflect a corrected tax liability (before any penalties or interest) of $198,693, to be compared with a tax liability of $2,044 as shown on Foster's tax return, and with a tax liability of $326,018 as originally assessed by the IRS.

8. Foster argues that the $9,814.07 penalty under IRC § 6651(a)(3) should be abated because her failure to include any portion of the tort recovery in her tax return was "due to reasonable cause and not due to wilful neglect." To be sure, prior to the *O'Gilvie* decision in 1996 there was good reason to believe that punitive damages were covered by the § 104(a)(2) exclusion. This does not address her failure to include the interest in gross income. But what is more significant is that the penalty being imposed stems from her delay—in 1997 after the deficiency notice—in paying the assessment, not her failure in 1995 to report as gross income any portion of the recovery. Nor is the court persuaded that the government has incorrectly calculated the potential interest on the refund.

56 calls for rendition of judgment when appropriate, as a matter of law, from the facts shown to be without material dispute.

By successfully contending for exclusion from her gross income of most of the amount paid by Life of Georgia, resulting in a refund of about 70% of what was sought in this action, Foster satisfies the requirement for an award of litigation costs under IRC § 7430(c)(4)(A)(ii)(II).

The court does not find, however, that under § 7430(c)(4)(A)(i) the position of the United States (*i.e.*, with respect to *Cotnam*) was not substantially justified. Yes, the court does conclude that *Cotnam* does control most of the issues respecting attorneys' fees and, until the Court of Appeals or Supreme Court rules otherwise, is binding on this court.

But there are serious and legitimate questions as to whether the holding in *Cotnam* should continue to be followed in this or other circuits. Strong arguments can be made—and presumably will be made by the government in seeking *en banc* consideration of this issue in the *Davis* case or on appeal of this case—that *Cotnam* is not consonant with Supreme Court decisions like *Horst* and, indeed, is based on a misinterpretation of Alabama law involving contingent fee contracts and attorneys' lien rights. In particular, *Cotnam* did not give attention to the continuing control that, even after entering into a contingent fee contract, the tort plaintiff has with respect to settlement of the entirety of the claim or to the continuing power of the client to discharge an attorney and effectively cancel the "assignment" of a share in later recoveries. The 1998 appeal by the government of *Davis*, filed before this case was brought, indicates that its attack upon *Cotnam* represents a fundamental disagreement with that decision, and not some personal animus against Foster in the present case. The rejection in January 2000 by a second appellate court (the Sixth Circuit in the *Estate of Clarks* case) does not support an assertion that the government's in this case was without substantial foundation. This court determines that Foster is not entitled to litigation costs under § 7430.

## II. Damage Claim under IRC § 7433.

Foster's damage claim under IRC § 7433 is not founded on any collection activity by the IRS alleged to be illegal or contrary to the provisions of the Code. Nor does Foster assert that a damage claim would

arise under that section whenever the IRS makes an assessment that is ultimately determined to be incorrect. The essence of Foster's contention is that—if the IRS takes measures, albeit authorized under the Code, to collect an assessed deficiency (as here, by levying on an annuity policy), rather than simply waiting for a taxpayer to voluntarily pay a deficiency—then the government is subject to potential liability under § 7433 on proof that it should have known that the assessment was excessive. While there are potential evidentiary problems that Foster would face if allowed to proceed with this claim, these are not now before the court, which is considering the government's motion to strike or dismiss this count.

Several district court decisions, starting with *Miklautsch v. Gibbs*, 90-2 USTC ¶ 50,587 (D. Alaska Nov. 6, 1990) have adopted Foster's thesis. But that construction of § 7433 has been rejected by the only two Courts of Appeals to consider the question (as well as by other district courts). See *Gonsalves v. IRS*, 975 F.2d 13 (1st Cir. 1992); *Shaw v. United States*, 20 F.3d 182 (5th Cir.), *cert. denied*, 513 U.S. 1041 (1994). This court concludes that *Miklautsch* reached an incorrect decision. The government's motions in this case to strike and to dismiss count II will be granted.

This the  13  day of March, 2000.

                                                        United States District Judge